MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: (619) 758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
Email: marco@coastlawgroup.com

Attorneys for Plaintiffs
SAN DIEGO COASTKEEPER and COASTAL ENVIRONMENTAL RIGHTS
FOUNDATION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>MILLER BARZ ENTERPRISES, INC., a California Corporation, doing business as Allways Metal Recycling,<br><br>        Defendant. | Civil Case No.: **'19 CV0953 DMS WVG**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper (collectively referred to herein as "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 and § 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On October 23, 2018, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Dan Miller of Allways Metal Recycling, located at 1411-1425 N. Magnolia Ave, El Cajon, CA 92020, and the Registered Agent for Miller Barz Enterprises, Inc., located at 2127 Olympic Parkway, Ste. 250, #348, Chula Vista, CA 91915, regarding violations of the Clean Water Act, and of Plaintiffs' intention to file suit against Defendant.

3.     The Notice Letter was sent to the Facility, the registered agent for Defendant as required by 40 C.F.R. § 135.2(a)(2), as well as the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of the Notice Letter is attached hereto as Exhibit A and incorporated herein.

4.     More than sixty days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. (33

U.S.C. § 1365(b)(1)(B)). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.     INTRODUCTION

6.     This complaint seeks relief for the Defendant's unlawful discharge of pollutants into waters of the United States from its operations at 1425 N. Magnolia Ave, El Cajon, CA 92020 ("Allways Facility" or "Facility").

7.     Specifically, Defendant has been discharging and continues to discharge polluted storm water and non-storm water from the Facility into Forester Creek, the San Diego River, and the Pacific Ocean (collectively referred to as the "Receiving Waters") in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301,1342.

8.     This complaint also seeks relief for Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of California's General Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ*) ("Industrial Permit"). This complaint further seeks relief to prevent discharges in violation of the Industrial Permit as amended by *Order No. 2014-0057-DWQ* ("New Industrial Permit").

9.     Defendant's violations of these substantive and procedural requirements are ongoing and continuous violations of the Clean Water Act, Industrial Permit, and New Industrial Permit.

10.     Plaintiffs seek a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for

Defendant's repeated and ongoing violations of the Clean Water Act.

11.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Allways Facility, flow into storm drain systems, local tributaries, Forester Creek, the San Diego River, and the Pacific Ocean. Among these Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, bird, reptile, amphibian, and mammal species as well as macro-invertebrate and invertebrate species. This discharge of pollutants in storm water from industrial activities at the Allways Facility contributes to the impairment of downstream waters and compromises or destroys their beneficial uses.

## III.     PARTIES

### A.     San Diego Coastkeeper and Coastal Environmental Rights Foundation

12.     Plaintiff San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California.

13.     San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

14.     San Diego Coastkeeper's office is located at 2825 Dewey Road, Suite 207, San Diego, California, 92106.

15.     Plaintiff CERF is a non-profit public benefit corporation organized under

the laws of the State of California.

16.     CERF's office is located at 1140 South Coast Highway 101, Encinitas California, 92024.

17.     CERF was founded by surfers in North San Diego County and active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

18.     Plaintiffs have thousands of members who live and/or recreate in and around Forester Creek, the San Diego River, and the Pacific Ocean ("Receiving Waters").

19.     Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

20.     Discharges of polluted storm water from the Allways Facility degrade water quality, harm aquatic life in the Receiving Waters, and impair Plaintiffs' members' use and enjoyment of the Receiving Waters.

21.     Defendant's polluted discharges from the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Industrial Permit.

22.     The relief sought herein will redress the harms to Plaintiffs caused by Defendant's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs' members, for which harm they have no other plain, speedy or adequate remedy at law.

**B.     The Facility Owner and/or Operator**

23.     Plaintiffs are informed and believe that Miller Barz Enterprises, Inc. is a California Corporation doing business as Allways Metal Recycling.

24.     Plaintiffs are informed and believe that Miller Barz Enterprises, Inc. is the owner of Allways Facility.

25.     Plaintiffs are informed and believe that Miller Barz Enterprises, Inc. is the operator of Allways Facility.

## IV.   STATUTORY BACKGROUND

### A.     The Clean Water Act

26.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

27.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (S*ee* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

28.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States,* 547 U.S. 715 (2006). A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Id.* at 780.

29.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Id.* at 783.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

30.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

31.     Section 402(b) of the CWA allows each state to administer its own EPA-approved permit for storm water discharges. 33 U.S.C. § 1342(b). In California, the State Board is charged with regulating pollutants to protect California's water resources.

32.     Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

33.     The Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

34.     Section 505(a)(1) of the CWA provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).

35.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

36.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring after January 27, 2009 and $54,833 for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4.

37.     Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. 33 U.S.C. § 1365(d).

**B.     Industrial Permit**

38.     The Industrial Permit, NPDES General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ is an NPDES permit adopted pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R § 123.25. In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. The Industrial Permit as amended pursuant to Order No. 2014-0057-DWQ became effective July 1, 2015 ("New Industrial Permit").

39.     Failure to comply with the Industrial Permit or New Industrial Permit constitutes a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A.).

**Discharge Prohibitions and Effluent Limitations of the Industrial Permit**

40.     Discharge Prohibitions A(1) of the Industrial Permit and III.B. of the New Industrial Permit prohibit the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibitions A(2) of the Industrial Permit and III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

41.     Effluent limitations B(3) of the Industrial Permit and Sections I.D and V.A. of the New Industrial Permit require facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at

40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform, among others.

42.     EPA's NPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity ("MSGP") sets numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

43.     The EPA Benchmarks provide an objective standard to determine whether a facility's Best Management Practices ("BMPs") are successfully developed and/or implemented. *See* EPA Proposed Multi-Sector General Permit (2013), Fact Sheet, p. 50; *see also*, EPA Multi-Sector General Permit (2008), Fact Sheet, p. 106; EPA Multi-Sector General Permit, 65 Federal Register 64839 (2000).

44.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *See* MSGP Fact Sheet, pp. 55-56. The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. *Id*. at 52. Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. *Id*. at 65.

45.     The Section I(M) and Finding 62 of the New Industrial Permit include Numeric Action Levels ("NALs") that are based on Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." *See* Section I(M) (Finding 61) of the New Permit.

46.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

47.     Effluent limitations B(1) of the Industrial Permit and Sections I.K and V.B. of the New Industrial Permit require facility operators of facilities in specific industrial categories to comply with Effluent Limitations Guidelines at 40 C.F.R. Chapter 1 Subchapter N ("Subchapter N").

**Receiving Water Limitations of the Industrial Permit**

48.     Industrial Permit Receiving Water Limitation C(1) and New Industrial Permit Receiving Water Limitation VI.B. prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts human health or the environment.

49.     Industrial Permit Receiving Water Limitation C(2) and New Industrial Permit Receiving Water Limitation VI.A. prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

50.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and/or the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

51.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the *Water Quality Control Plan for the San Diego Basin*, California Regional Water Quality Control Board, San Diego Region ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

52.     The CTR includes numeric criteria set to protect human health and the environment in the state of California.[1]

53.     The CTR limits are, in part, as follows for freshwater: lead – .065 mg/L;

---

[1] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available at*: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

zinc – .12 mg/L; selenium – .005 mg/L; copper – .013 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

54.     The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.

55.     The existing Beneficial Uses for Forester Creek downstream from the point at which it receives polluted storm water and non-storm water discharges from the Facility include: Contact Water Recreation; Non-contact Water Recreation; Wildlife Habitat; Warm Freshwater Habitat; and Industrial Service Supply. *See* Basin Plan at Table 2-2. Forester Creek also has a potential Beneficial Use of Municipal and Domestic Supply. *Id*.

56.     The Beneficial Uses for the San Diego River downstream of the Slaughterhouse Facility's point of discharge include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, Preservation of Biological Habitats of Special Significance, Rare, Threatened, or Endangered Species, Agricultural Supply, and Industrial Service Supply. *Id.*

57.     The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation, Commercial and Sport Fishing, Wildlife Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, Aqua Culture, and Rare, Threatened, or Endangered Species. *Id*. at Table 2-3.

58.     A surface water that cannot support its Beneficial Uses listed in the Basin Plan is designated as an impaired water body pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

59.     According to the 2016 303(d) List of Impaired Water Bodies, Forester Creek is impaired for benthic community effects, indicator bacteria (including E. Coli,

fecal coliform, and total coliform), nitrogen, phosphorus, selenium, and total dissolved solids.

60.     According to the 2016 303(d) List of Impaired Water Bodies, the lower reach of the San Diego River is impaired for benthic community effects, cadmium, enterococcus, nitrogen, low dissolved oxygen, phosphorus, total dissolved solids, and toxicity.

61.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. *See* Basin Plan at p. 1-1.

62.     The Basin Plan water quality objective for iron for freshwater in Forester Creek, Hydrological Subarea 907.13 is 0.3 mg/L.

63.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the Storm Water Permit.

**Storm Water Pollution Prevention Requirements of the Industrial Permit**

64.     Section A(1) and Provision E(2) of the Industrial Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A. and B. of the New Industrial Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

65.     The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Sites, and identify and implement site-specific Best Management Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges. Industrial Permit, Section A(2); New Industrial Permit, Section X.C.1.

66.     To ensure its effectiveness, the SWPPP must be evaluated on an annual basis, and it must be revised as necessary to ensure compliance with the Permit. Industrial Permit, Sections A(9), (10); New Industrial Permit, Sections XA, X.B.1.

67.     Sections A(3) through A(10) of the Industrial Permit and Sections X.A to X.I. of the New Industrial Permit set forth the requirements for a SWPPP.

68.     The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity. Industrial Permit, Section A(4); New Industrial Permit, Section X.E.

**Monitoring and Reporting Requirements of the Industrial Permit**

69.      Dischargers are also required to prepare and implement a monitoring and reporting program ("M&RP"). Industrial Permit, Sections E(3), B(1); New Industrial Permit, Section XI.

70.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised as necessary, and to ensure that storm water discharges are in compliance with the Industrial Permit (up to July 1, 2015) and New Industrial Permit (July 1, 2015 and thereafter) Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Industrial Permit, Section B(2); New Industrial Permit, Finding J.56.

71.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water dischargers. Industrial Permit, Sections B(2)(a) and B(2)(d); New Industrial Permit Section XX.B. and Fact Sheet Section J., page 43.

72.     The Industrial Permit and the New Industrial Permit require that the SWPPP must be revised as necessary to ensure compliance with the Storm Water Permit. Industrial Permit; Section A(10)(d); New Industrial Permit, Section X.B.

73.     The Industrial Permit and New Industrial Permit require dischargers to

conduct visual observations for the presence of unauthorized non-storm water discharges, to document the source of any discharge, and to report the presence of any discolorations, stains, odors, and floating materials in the discharge.

74.     The Industrial Permit and New Industrial Permit require dischargers to visually observe drainage areas during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants.

75.     Both the Industrial Permit and New Industrial Permit require dischargers to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges.

76.     The Industrial Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season. Industrial Permit, Section (B)(5). The New Industrial permit requires dischargers to collect and analyze storm water samples from two storm events with the first half of each reporting year (July 1 to December 31) and two from the second half (January 1 to June 30). New Industrial Permit, Section XI.B.2.

77.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility. Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6.

78.     Dischargers must submit "Annual Reports" to the Regional Board in July of each year. Industrial Permit, Section B(14); New Industrial Permit, Section XVI.A.

79.     The Industrial Permit requires that all reports, certifications, or other information required by the Storm Water Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. Industrial Permit Section C(9); New Industrial Permit Section XX.K.

80.     The Industrial Permit requires that signatories under Sections C(9) and C(10) of the Industrial Permit and Section XX.K. and XX.L. of the New Industrial Permit to make the following certification: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

81.     Section C(11)(d) of the Industrial Permit requires facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. Industrial Permit, Section C(11)(d).

82.     Section XVI.B. of the New Industrial Permit requires facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports must contain (1) a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the Industrial Permit, (2) an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and (4) the date(s) of the Annual Evaluation. New Industrial Permit, Section XVI.B.

/././

Complaint for Declaratory and Injunctive Relief and Civil Penalties

/././

## V.    STATEMENT OF FACTS

### A.    Past and Present Industrial Activity at the Allways Facility

83.    Plaintiffs are informed, believe, and thereon allege Defendant Miller Barz Enterprises, Inc. owns and operates the Allways Facility located at 1425 N. Magnolia Ave., El Cajon, CA 92020.

84.    Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator enrolled under the General Industrial Permit under the name "Allways Metal Recycling," and submitted the most recent NOI on June 8, 2017, Waste Discharge Identification ("WDID") Number 9 37I027211.

85.    Plaintiffs are informed, believe, and thereon allege that the prior Facility operators enrolled under the General Industrial Permit on September 9, 2014 under the name "All Ways Recycling" at 15275 Olde Highway 80, El Cajon, California (WDID 9 37I025049).

86.    Plaintiffs are informed, believe, and thereon allege that the Facility also operated at 1425 N. Magnolia Ave. and enrolled under the General Industrial Permit on February 21, 2013 (WDID 9 37I024092), after prompting from the County of San Diego.

87.    Plaintiffs are informed, believe, and thereon allege the Allways Facility is approximately 1.61 acres.

88.    Plaintiffs are informed, believe, and thereon allege the Facility is assigned the standard industrial classifications ("SIC") code 5093, "Scrap Recycling and Waste Recycling Facilities."

89.    Plaintiffs are informed, believe, and thereon allege that the Allways Owner and/or Operator has a pattern and practice of Clean Water Act and Industrial Permit noncompliance. For example, Dan Miller Auto Salvage (owned and operated by Daniel Miller/Miller's Towing, Inc.) located at 301 Cypress Lane, El Cajon, California 92020, operated for years without obtaining Industrial Permit Coverage despite repeated notices

Complaint for Declaratory and Injunctive Relief and Civil Penalties

of noncompliance from the City of El Cajon and Regional Water Board.

90.     Plaintiffs are informed, believe, and thereon allege that Daniel Miller, the CEO of Miller Barz Enterprises, Inc., operated a scrap recycling and auto salvage facility at 301 Cypress in violation of the Clean Water Act for years before shutting down operations last year.

91.     Plaintiffs are informed, believe, and thereon allege that Daniel Miller is also a member of Miller Horn, LLC, owner of the property located at 15275 Olde Highway 80, El Cajon, California 92021, All Ways Recycling's prior location.

92.     Plaintiffs are informed, believe, and thereon allege that Miller's Towing previously operated at 15275 Olde Highway 80 and was repeatedly notified of storm water violations and non-compliance.

93.     Plaintiffs are informed, believe, and thereon allege that the Allways Recycling SWPPP refers to the Facility as "All Ways Recycling" and is effective "July 1, 2015." 2018 SWPPP, cover page, and p. 1.

94.     Plaintiffs are informed, believe, and thereon allege that the All Ways Recycling SWPPP (WDID 9 37I024092) is virtually identical to the current Allways Facility SWPPP.

95.     Video from a May 2018 Facility fire also depicts employees wearing "All Ways" Recycling uniforms and the Facility sign also reads "All Ways Recycling." *Fire Spread over El Cajon recycling yard*, CBS News 8 (May 16, 2018) *available at* http://www.cbs8.com/story/38207547/firefighters-on-scene-of-equipment-fire-in-el-cajon.

96.     Plaintiffs are informed, believe, and thereon allege that to this day the Facility sign and main building read "All Ways Recycling," and the Facility website reflects the name "All Ways Recycling" on the location tab.

97.     Thus, the Allways Metal Recycling Owner and/or Operator holds themselves out as the successors to All Ways Recycling, acknowledging the current Facility is a mere continuation of the All Ways Recycling Facility.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

98.     Based on the aforementioned history and information available to CERF and Coastkeeper, Plaintiffs are informed, believe, and thereon allege that Allways Metal Recycling/Miller Barz Enterprises has assumed the assets and liabilities of its predecessor, Red's Ferrous Metal, Inc. and All Ways Recycling. *See Ray v. Alad Corp*. 19 Cal.3d 22, 28 (1977) ("As typically formulated the rule states that the purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."). Therefore, Allways is liable for all prior Clean Water Act and Industrial Permit violations of its predecessor, All Ways Recycling.

99.     Plaintiffs are informed, believe, and thereon allege various industrial materials comprised of metals, fuels, nutrients, bacteria, oils and grease, organic compounds, debris, and sediment are utilized and/or present onsite.

100.     Plaintiffs are informed, believe, and thereon allege the Facility Owner and/or Operator engages in the following industrial operations: scrap metal recycling, auto crushing, washing and cleaning with related supplies and equipment, operation of heavy machinery, receipt and shipment of autos and auto parts, stockpiling and storage of materials (including loading and unloading), material processing, torch cutting, baling, shearing, and other activities related to auto parts and other metal scrap recycling.

101.     Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations at the Facility include, but are not limited to: ammonia as nitrogen; pH-affecting substances; oil and grease; total suspended solids; enterococcus; nitrate, nitrite, and total nitrogen; phosphorous; total coliform; fecal coliform; BOD; COD; gasoline; diesel; selenium; copper, cadmium, chromium, mercury, zinc, aluminum, lead, iron, chlorinated solvents, and detergents as chemicals associated with

the Facility's SIC code.[2]

102.     Plaintiffs are informed, believe, and thereon allege that most operations at the Facility occur outdoors and expose pollutants to rainfall.

103.     Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the Facility are exposed to storm water.

104.     Plaintiffs are informed, believe, and thereon allege activities at the Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facility. During rain events, this pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

105.     Plaintiffs are informed, believe, and thereon allege water application for washing and cleaning activities, as well as air conditioning condensate, is discharged from the Facility into Receiving Waters. For example, during an August 15, 2017 inspection, the Regional Board noted air conditioning condensate was flowing away from the building toward the northeast corner of the Facility "where there is spilled oil and other wastes including boxes of nickel cadmium batteries." Whitney Ghoram Inspection, August 15, 2017, p. 12.

106.     Discharges of water used for washing and cleaning activities, water from air conditioning condensate, and pollutants in such water entering the storm water conveyance system constitute unauthorized non-storm water discharges.

107.     Plaintiffs are informed, believe, and thereon allege that the Facility lacks effective BMPs to control the flow of storm water and non-storm water from the Facility into storm water conveyance systems.

108.     Plaintiffs are informed, believe, and thereon allege that the Facility lacks effective BMPs to control the flow of used for washing and cleaning activities, and

---

[2] Industrial Stormwater Fact Sheet Series, Sector N: Scrap Metal Recycling and Waste Recycling Facilities, U.S. EPA Office of Water, Doc. No. EPA-833-F-06-029 (December 2006), *available at* https://www.epa.gov/sites/production/files/2015-10/documents/sector_n_scraprecycling.pdf.

water from air conditioning condensate, from the Facility into storm water conveyance systems and Receiving Waters.

109.    Plaintiffs are informed, believe, and thereon allege that the Facility lacks effective BMPs to control the flow of contaminated storm water and non-storm water.

110.    Plaintiffs are informed, believe, and thereon allege that metals, fuels, nutrients, bacteria, oils and grease, organic compounds, debris, sediment, and other pollutants have been and continue to be conveyed from the Facility into storm drain conveyance systems and Receiving Waters.

111.    Plaintiffs are informed, believe, and thereon allege that the Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the Facility.

112.    Plaintiffs are informed, believe, and thereon allege storm water is discharged from the Facility from multiple discharge points into Receiving Waters.

113.    Information available to Plaintiffs indicates that each of the surface waters into which the Facility discharges polluted storm water are tributaries to traditional navigable waters such as the San Diego River and the Pacific Ocean.

114.     Plaintiffs are informed, believe, and thereon allege the Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters. Elevated levels of bacteria, metals, nutrients, and sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their beneficial uses.

**B.    The Allways Facility and its Associated Discharge of Pollutants**

115.    Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Allways Facility discharges polluted storm water associated with industrial activities at the Facility via storm drainage systems and into the Receiving Waters.

116.    Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Facility discharges polluted storm water are waters of the United

Complaint for Declaratory and Injunctive Relief and Civil Penalties

States and therefore the Industrial Permit properly regulates discharges to those waters.

117.    Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Allways Facility has exceeded numerous CTR Water Quality Standards in California. For example, Defendant's monitoring data from January 9, 2018 indicates levels of zinc at 0.34 mg/L, which is more than double the freshwater CTR limit and EPA Benchmark of 0.12 mg/L.[3]

118.    Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Allways Facility has exceeded multiple Basin Plan Water Quality Objectives applicable to Forester Creek and the San Diego River. For example, Defendant's monitoring data from January 9, 2018 indicates levels of iron at 0.9, three times higher than the Basin Plan Objective of 0.3 mg/L.

119.    Plaintiffs are informed, believe, and thereon allege that during every significant rain event that has occurred at the Allways Facility since October 23, 2013 through the present, Defendant has discharged and continues to discharge storm water from the Facility that contains numerous pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

120.    Information available to CERF and Coastkeeper, including via review of publicly available information and observations, indicates BMPs that achieve BAT/BCT have not been developed and/or implemented at the Facility. Indeed, Allways' failure to implement appropriate BMPs resulted in a toxic fire in May 2018, which in turn caused overflow of oil, and the discharge of polluted non-storm water and sewage. According to eye witnesses, this fire was not the first of its kind at the Facility.

121.    On August 15, 2017, the San Diego Regional Water Quality Control Board conducted a site inspection of the Facility and found numerous violations, noting excessive piles of metal, appliances and vehicles.

---

[3] This benchmark value is hardness-dependent. Assuming the 100 mg/L water hardness range applies, the benchmark is .12 mg/L. (MSGP Fact Sheet, p. 55)

122.     Publicly available photographs of the Regional Board site visit show a site covered in debris, dust, piles of scrap and potentially toxic materials. Numerous 55-gallon drums were found onsite without labels or secondary containment. The inspector noted poor housekeeping BMPs, scrap, engines, transmission cores, waste, e-waste and hazardous material exposure to storm water. As a result of the inspection, the Regional Board issued a staff enforcement letter.

123.     The latest SWPPP fails to account for the violations identified by the Facility's monitoring data, the County of San Diego and Regional Board's site visits, and the numerous toxic fires, ensuring these violations continue.

124.     Because the CTR and Basin Plan are applicable WQS under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQS, and thus violate Receiving Water Limitation C(2) of the 1997 Permit or Receiving Water Limitation VI.A of the 2015 Permit.

125.     Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impacts human health, thus violating the Permit Receiving Water Limitation C(1) of the1997 Permit, and VI.B of the 2015 Permit.

126.     Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

127.     Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since October 23, 2013, and Coastkeeper and CERF will update the dates of violations when additional information and data

become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since October 23, 2013.

128.     Plaintiffs are informed, believe, and thereon allege that the Allways Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the General Industrial Permit Receiving Water Limitations. The Facility has been in violation since October 23, 2013, and Coastkeeper will update the dates of violation when additional information and data becomes available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since October 23, 2013.

129.     Information available to Coastkeeper and CERF indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. For example, unauthorized non-storm water discharges occur from the Facility's irrigation, washing and cleaning activities and air conditioning condensate.

130.     Information available to Coastkeeper and CERF indicates that the Allways Owner and/or Operator conducts these activities without BMPs to prevent related non-storm water discharges. For example, during its August 15, 2017 inspection, the Regional Board noted air conditioning condensate was flowing away from the building toward the northeast corner of the Facility "where there is spilled oil and other wastes including boxes of nickel cadmium batteries." Whitney Ghoram Inspection, August 15, 2017, at 12.

131.     Non-storm water discharges resulting from washing and cleaning are not from sources that are listed among the authorized non-storm water discharges in Section IV.A. of the Permit. Further, the San Diego Regional Municipal Separate Storm Sewer System ("MS4") Permit Section E.2.a. prohibits the discharge of unauthorized non-storm water as an illicit discharge.

132.     These discharge violations are ongoing and will continue until the Allways Owner and/or Operator develops and implements BMPs that prevent prohibited non-

Complaint for Declaratory and Injunctive Relief and Civil Penalties

storm water discharges or obtain separate NPDES permit coverage.

133.     Each time the Allways Owner and/or Operator discharges prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Plaintiffs will update the number and dates of violations when additional information becomes available. The Allways Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since October 23, 2013.

## C.     The Facility SWPPP Fails to Comply with Permit Requirements

134.     Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Facility.

135.     The inadequacy of the BMPs at the Facility is a result of Defendant's failure to develop and implement an adequate SWPPP and companion M&RP.

136.     County and Regional Water Board Inspections have put the Facility Owner and/or Operator on notice for years of the need to adequately cover materials stored outdoors and implement other required BMPs, but Facility Owner and/or Operator has consistently failed to revise the Facility SWPPP, implement required BMPs, and undertake recommended and required corrections. For example, Plaintiffs are informed, believe, and thereon allege that raw materials are stored outside without adequate cover or containment, resulting in discharges of polluted storm water and fugitive dust emissions.

137.     Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP fails to adequately assess pollutants and pollutant sources at the Facility. For example, the SWPPP fails to adequately assess the Facility's potential contribution of pollutants for which the Receiving Waters (Forester Creek and the San Diego River) are impaired in violation of the Industrial Permit and New Industrial Permit.

138.     Storm water discharges from the Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

139.     Plaintiffs are informed, believe, and thereon allege that since at least October 23, 2013 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT and Effluent Limitation Guidelines at the Facility.

140.     Plaintiffs are informed, believe, and thereon allege that Allways Facility's repeated exceedances of EPA Benchmarks and applicable Water Quality Standards over the past five years for numerous pollutants indicate that the Facility has failed and continues to fail to meet BAT/BCT.

141.     Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

142.     Based on investigations of the Allways Facility, Plaintiffs are informed and believe that Defendant has failed to develop and implement an adequate SWPPP since at least October 23, 2013 through the present.

143.     Defendant has not developed and/or implemented BMPs to adequately minimize the exposure of pollutants to storm water at the Facility.

144.     Defendant has not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility.

145.     Defendant has not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in storm water prior to the discharge.

146.     Defendant has not developed and/or implemented adequate measures to reduce or eliminate storm water pollution that constitute BAT/BCT.

147.     Defendant has not developed and/or implemented BMPs at the Facility that adequately prevent or control contaminated storm water from being discharged at the Facility.

148.     Defendant has not developed and/or implemented BMPs at the Facility

that adequately prevent or control non-storm water discharges from being discharged at the Facility.

149.    Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve storm water discharges that meet EPA Benchmarks, NALs, or applicable Water Quality Standards.

150.    Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve discharges that meet Effluent Limitation Guidelines.

151.    Defendant has not adequately evaluated and revised the Facility's SWPPP to address these failures. For example, the latest SWPPP fails to account for the violations identified by Allways's monitoring data, the County of San Diego and Regional Board's site visits, and the numerous toxic fires, ensuring these violations continue.

152.    Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

153.    Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

154.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the Allways Facility since at least October 23, 2013.

155.    Each day that Defendant has operated the Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**D.    Defendant's Monitoring and Reporting Program at the Facility**

156.    From October 23, 2013 through June 30, 2015, the Facility was required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5).

157.    Sampling and analysis procedures require that a sample be taken from all

discharge locations at the Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. Industrial Permit, Sections B(5) and B(7).

158.    From June 30, 2015 through the present Facility is required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

159.    Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the Facility. Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6.

160.    All monitoring data must be uploaded to SMARTS within 30 days of obtaining all results for each sampling event. New Industrial Permit, XI.B.11.a.

161.    Plaintiffs are informed, believe, and thereon allege that despite the high levels of pollutants reported in the samples that were taken at the Facility, the Defendant has not sampled and submitted sampling reports as required.

162.    Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully and consistently sampled and reported for ammonia as nitrogen; pH-affecting substances; oil and grease; total suspended solids; enterococcus; nitrate, nitrite, and total nitrogen; phosphorous; total coliform; fecal coliform; BOD; COD; selenium; copper, cadmium, chromium, mercury, zinc, aluminum, lead, or iron as required by the Permit.

163.    Information available to Plaintiffs indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial

Permit.

164.     Information available to Plaintiffs indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

165.     Information available to Plaintiffs indicates that Defendant failed to collect or analyze any storm water samples during the 2012-2013, 2013-2014, 2014-2015, 2015- 2016, and 2016-2017 reporting periods.

166.     The Allways Facility Owner and/or Operator has collected and analyzed only one storm water sample, on January 9, 2018. Information available to Plaintiffs indicates that Defendant failed to collect the required number of samples during the 2018-2019 reporting period.

167.     Information available to Plaintiffs indicates that Defendant has thus far failed to collect and analyze any storm water samples during the 2018-2019 reporting period and will again fail to collect the required number of samples in violation of the Industrial Permit.

168.     Information available to Plaintiffs indicates that when Defendant did collect and analyze storm water samples, Defendant failed to monitor for additional pollutants for which the Receiving Waters are impaired, such as selenium, bacteria, nitrogen and phosphorus.

169.     Information available to Plaintiffs indicates that Defendant also failed to monitor for additional pollutants which are likely present on site such as copper, cadmium, and chromium, bacteria, nitrogen, mercury, chlorinated solvents, and detergents as chemicals associated with the Facility's SIC code.

170.     Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully and consistently sampled and reported for nutrients, fertilizers, total suspended solids, pH-affecting substances, oil and grease, E. coli, total coliform, enterococcus, metals, nitrate, nitrite, and total nitrogen, fecal coliform, and ammonia as nitrogen, as required by the Permit.

171.     Information available to Plaintiffs indicates that Defendant also failed to collect samples from all discharge points as required by the Industrial Permit and New Industrial Permit.

172.     Information available to Plaintiffs indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in
Violation of the Industrial Permit's Discharge Prohibitions and
Receiving Water Limitations and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

173.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

174.     Plaintiffs are informed, believe, and thereon allege that as a result of the operations at the Facility, during every significant rain event, storm water containing pollutants harmful to fish, plant, bird life, and human health is discharged from the Facility to the Receiving Waters.

175.     Plaintiffs are informed, believe, and thereon allege that Defendant's discharges of contaminated storm water from the Facility have caused, continue to cause, and threaten to cause pollution, contamination, and/or nuisance to the waters of the United States in violation of Discharge Prohibition A(2) of the Industrial Permit and Sections III.C. and VI.C of the New Industrial Permit.

176.     Plaintiffs are informed, believe, and thereon allege that these discharges of contaminated storm water have adversely affected and continue to adversely affect human health and the environment in violation of Receiving Water Limitation C(1) of the Industrial Permit and Section VI.B. of the New Industrial Permit.

177.     Plaintiffs are informed, believe, and thereon allege that these discharges of contaminated storm water have caused or contributed to and continue to cause or contribute to exceedances of Water Quality Standards in violation of Receiving Water

Limitation C(2) of the Industrial Permit, and Discharge Prohibition III.D. and Receiving Water Limitation VI.A. of the New Industrial Permit.

178.   Plaintiffs are informed, believe, and thereon allege that from at least October 23, 2013 through the present, Defendant has discharged, and continues to discharge, contaminated storm water from the Facility to Receiving Waters in violation of the prohibitions of the Industrial Permit.

179.   Plaintiffs are informed, believe, and thereon allege that Defendant's violations of the Industrial Permit and the CWA are continuous and ongoing.

180.   Defendant will continue to be in violation of the Industrial Permit requirements each day that the Facility discharges contaminated storm water in violation of Industrial Permit prohibitions.

181.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Allways Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

182.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

183.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

/././

/././

/././

/././

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water in
### Violation of the Industrial Permit's Effluent Limitations
### and the Clean Water Act
### (Violations of 33 U.S.C. §§ 1311(a), 1342)

184.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

185.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement BMPs at the Allways Facility that achieve compliance with BAT/BCT requirements of the Industrial Permit and the CWA.

186.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement BMPs at the Facility that achieve compliance with Effluent Limitations Guidelines of the Industrial Permit and the CWA.

187.     Sampling of the Facility's storm water discharges as well as Plaintiffs' observations of the Facility demonstrate that Defendant has not developed and has not implemented BMPs that meet the standards of BAT/BCT. Thus, Defendant is in violation of Effluent Limitations B.3. of the Industrial Permit and V.A. of the New Industrial Permit.

188.     Plaintiffs are informed, believe, and thereon allege that Defendant has been in daily and continuous violation of the BAT/BCT requirements of the Industrial Permit and the CWA at the Facility every day since at least October 23, 2013, and of the BAT/BCT requirements of the New Industrial Permit at the Facility since July 1, 2015.

189.     Plaintiffs are informed, believe, and thereon allege that Defendant has been in daily and continuous violation of the Effluent Limitations Guidelines requirements of the Industrial Permit and the CWA every day since at least October 23, 2013, and of the Effluent Limitations Guidelines requirements of the New Industrial Permit since July 1, 2015.

190.     Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a separate violation of the New Industrial Permit and the CWA. New Industrial Permit §§

Complaint for Declaratory and Injunctive Relief and Civil Penalties

I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

191.    Plaintiffs are informed, believe, and thereon allege that Defendant's violations of BAT/BCT requirements of the Industrial Permit and the CWA at the Facility is ongoing.

192.    Plaintiffs are informed, believe, and thereon allege that Defendant's violations of the Effluent Limitations and the CWA at the Facility are ongoing.

193.    Defendant will continue to be in violation each day that the Facility operates without adequately developing and/or implementing BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges.

194.    Defendant will continue to be in violation each day that the Facility operates without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines to prevent or reduce pollutants associated with industrial activity in storm water discharges.

195.    Each day that Defendant operates the Allways Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

196.    Each day that Defendant operates the Allways Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

197.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

198.    An action for injunctive relief under the CWA is authorized by 33 U.S.C.

§ 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Failure to Develop and/or Implement an Adequate
Storm Water Pollution Prevention Plan
in Violation of the Industrial Permit and Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

199.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

200.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement an adequate SWPPP for the Facility that meets the requirements set out in Section A and Provision E of the Industrial Permit and Section X of the New Industrial Permit.

201.     Defendant has been in violation of the SWPPP requirements at the Facility every day since at least October 23, 2013.

202.     Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA at the Facility are ongoing.

203.     Defendant will continue to be in violation of the SWPPP requirements each day the Facility operates with an inadequately developed and/or implemented SWPPP.

204.     Each day that Defendant operates the Allways Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

205.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

206.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
**Failure to Implement an
Adequate Monitoring and Reporting Program
In Violation of the Industrial Permit and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

207.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

208.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement an adequate M&RP for the Facility as required by Section B and Provision E(3) of the Industrial Permit and Section XI of the New Industrial Permit.

209.     Plaintiffs are informed, believe, and thereon allege that conditions at the Facility, as determined via sampling of storm water discharges from the Facility, and the annual reports submitted by Defendant all demonstrate that the Facility has not implemented an adequate M&RP that meets the requirements of the Industrial Permit and New Industrial Permit.

210.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to collect samples at the Facility from all discharge points for all required pollutants during all storm events in violation of Section B(5) of the Industrial Permit and XI.B. of the New Industrial Permit.

211.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to identify inadequacies in its SWPPPs and BMPs at the Facility.

212.     Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing at the Facility.

213. Defendant will continue to be in violation of the Industrial Permit, New Industrial Permit and the CWA each day the Facility operates with an inadequately implemented M&RP.

214. Each day that Defendant operates the Allways Facility without implementing an adequate M&RP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

215. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

216. An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Discharge of Unauthorized Non-Stormwater
Discharges in Violation of Sections A.1. of Industrial Permit
And III.B. of New Industrial Permit**

217. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

218. Plaintiffs are informed, believe, and thereon allege that Defendant is in violation of Section A.1. of the Industrial Permit and III.B. of the New Industrial Permit each day is has discharged unauthorized non-storm water containing pollutants from the Facility to the Waters of the United States.

219. By discharging unauthorized non-storm water containing pollutants from the Facility into Receiving Waters, Defendant has been in violation of Section A.1. of the Industrial Permit and III.B. of the New Industrial Permit every day since October 23,

2013. Defendant will continue to be in violation each day it discharges unauthorized non-storm water discharges containing pollutants from the Facility to Receiving Waters.

220.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

221.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter

## VII.     RELIEF REQUESTED

222.     Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

a.     A Court order declaring Defendant to have violated and to be in violation of Section 301(a) and (b) of the CWA, 33 U.S.C. § 1311(a) and (b), for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33. U.S.C. § 1342(p), for failing to meet effluent limitations which meet BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Industrial Permit, and as of July 1, 2015, the New Industrial Permit for the Facility;

b.     A court order enjoining the Defendant from discharging pollutants from the Facility, which discharge to Receiving Waters;

c.     A Court order enjoining the Defendant from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Permit and New Industrial Permit;

d.     A Court order assessing civil monetary penalties of $37,500 per day

1  per violation for each violation of the CWA at the Facility occurring after January 27,

2  2009 but before November 2, 2015, and $54,833 for violations occurring after

3  November 2, 2015, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil

4  Monetary Penalties for Inflation, 40 C.F.R. § 19.1-19.4;

5         e.    A Court order requiring Defendant to take appropriate actions to

6  restore the quality of waters impaired by its activities;

7         f.    A Court order awarding Plaintiffs their reasonable costs of suit,

8  including attorney, witness, expert, and consultant fees, as permitted by Section 505(d)

9  of the Clean Water Act, 33 U.S.C. § 1365(d);

10         g.    Any other relief as this Court may deem appropriate.

11  Dated: May 22, 2019

12                        Respectfully submitted,

13                        COAST LAW GROUP LLP

14

15                        By: s/Livia B. Beaudin

16                        LIVIA B. BEAUDIN
                      Attorney for Plaintiffs

17                        COASTAL ENVIRONMENTAL
                      RIGHTS FOUNDATION

18                        E-mail: livia@coastlawgroup.com

19

20                        SAN DIEGO COASTKEEPER

21

22                        By: s/Matt O'Malley

23                        MATT O'MALLEY
                      Attorney for Plaintiffs

24                        SAN DIEGO COASTKEEPER

25                        E-mail: matt@sdcoastkeeper.org

26

27

28